[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff New Haven Savings Bank ("NHSB', or "the Bank") brought this action seeking foreclosure of its construction mortgage on certain property located in Waterbury which was owned by the defendant Common Construction Company, Inc. The plaintiff has gone to judgment on its complaint; it acquired title to the foreclosed property through a judgment of strict foreclosure. The defendant Marek Brothers Co., Inc. ("Marek") filed a mechanic's lien on the property which was later released when a bond was substituted for the lien. The matter before the court is Marek's counterclaim against NHSB seeking an award of money damages and attorneys' fees. Marek's claim is set forth in two counts, the first claiming promissory estoppel and the second claiming unjust enrichment.
The court finds the following facts: "Marek is a drywall contractor with offices in Houston, Texas. Marek entered into CT Page 8207 a written subcontract with T. Delmonico Associates, Inc. ("Delmonico") in April, 1989 to furnish and install drywall for the construction of an 88-unit apartment complex in Waterbury known as Pondview Estates. The contract price was $195,500. Delmonico was the general contractor for the job; the property owner was Common Construction Company, Inc.
Marek began work at Pondview Estates on April 17, 1989 and substantially completed the work by July 21, 1989. Marek issued four invoices for its work at Pondview Estates. The first was issued on May 6, 1989 in the amount of $31,671 and was paid in full. Marek received only partial payment for the second invoice in the amount of $113,661, which was issued June 6, 1989. The last two invoices, totalling approximately $50,000 were issued July 7, 1989 and July 14, 1989; no payments were made on either of these invoices. Marek has an unpaid balance on its subcontract for Pondview Estates of $102,829. Marek now seeks to hold NHSB liable for payment of that amount.
Marek's claim rests on the testimony of its vice president and general manager, Patrick Trojanowsky. He testified that prior to entering into the subcontract with Delmonico, Marek knew nothing about Delmonico or the project owner. Marek had Delmonico complete a "new account form" providing credit and other information concerning Delmonico. Marek obtained a Dun and Bradstreet credit report for Delmonico and also called various credit references for Delmonico before beginning work at Pondview. All of this investigation occurred prior to the signing of the subcontract.
Trojanowsky testified that in accordance with Marek's customary practice, he himself called Richard Johnson, an officer of NHSB, after all of the other investigation of Delmonico had been completed. He testified that Marek usually calls the bank providing the project financing and that call is made after all the other investigatory work is completed. The call to the bank, he said, is the deciding factor as to whether Marek will take the job.
Based on some notes in his calendar, Trojanowsky testified that he called Johnson on April 13, 1989, informed him that Marek was about to enter into a contract with Delmonico and that he wanted to make sure there were no problems with the project before Marek signed the contract. According to Trojanowsky's testimony, Johnson said that the project was "in good shape" and CT Page 8208 there were "no problems." As a result of this conversation, Trojanowsky signed the subcontract with Delmonico on April 19, 1989. Marek had begun work on the project on April 17, 1989.
Trojanowsky did not incur any difficulties with Pondview Estates until early June. At that time, Marek was preparing to issue its second invoice. Trojanowsky spoke with Tom Delmonico, the principal of the Delmonico corporation, who agreed to an invoice amount of $113,661. However, Delmonico told Trojanowsky that he would not be able to pay the entire amount of the second invoice because of some cost overruns for the project. Trojanowsky testified that he then called Michael Belfonti, the principal of Common Construction, and Richard Johnson at NHSB. Again relying on a page from his daily calendar, Trojanowsky testified that he called Johnson on June 5, 1989 and told him that he was only issuing his second invoice and there were already cost overruns. He testified that he asked Johnson what happened to the earlier report he had gotten from Johnson and that Johnson replied that he had known Belfonti for years and there was "no problem on the job," "no problem with the money." Trojanowsky testified that Marek continued work on Pondview Estates only because of this phone call of June 5 with Johnson as well as the prior one on April 13.
When Marek received only partial payment of $31,000 on its second invoice, Trojanowsky testified, he called Johnson again. Again, said Trojanowsky, Johnson said he'd been doing business with Belfonti for many years and "the money was good." Trojanowsky testified that again Marek decided to continue work on the job because of the Johnson phone call, which convinced Trojanowsky that Marek would be paid. Trojanowsky testified to further similar conversations with Johnson after July 21, 1989 on approximately a monthly basis.
Johnson's testimony corroborated Trojanowsky's to a certain extent. Johnson, a vice president of NHSB employed by the Bank for over thirty years, was in charge of the Bank's commercial mortgage department. Belfonti was a long-standing customer of the Bank, with whom Johnson had worked for eight to ten years. Belfonti's credit with the Bank was excellent and his loans had always been current. Johnson testified that he remembered getting phone calls from Trojanowsky on behalf of Marek, although he thought the first call was in May or June. He testified that Trojanowsky asked for Johnson's opinion as to whether there was enough money for Marek to get paid and Johnson CT Page 8209 said yes. Johnson testified that all of the calls, which continued into 1990, had a similar substance. Trojanowsky never asked Johnson for payment or a guaranty of payment. He only sought Johnson's opinion about the prospect of payment.
Johnson further testified that he believed his opinion when he gave it to Trojanowsky, that he honestly believed Marek would be paid, in part because the Bank was extending a new $600,000 loan to Belfonti in addition to the $4,000,000 construction mortgage. It wasn't until 1990 that Johnson became uncertain that Marek would get paid. In 1991, NHSB accelerated the construction loan and brought this action to foreclose the construction mortgage. Judgment of strict foreclosure entered on November 16, 1992. The total mortgage debt owed NHSB at that time was $6,120,827.50; the value of Pondview Estates was $1,700,000. NHSB finally sold the Pondview Estates property in August, 1993 for $2,250,000. The Bank's loss on the project after the sale was $3,750,000.
The court is not persuaded that Trojanowsky's testimony is fully credible. He has recounted the content of his conversations with Johnson differently on different occasions. For example, Trojanowsky introduced into evidence a written record which he made after July 21, 1989, when Marek's work was substantially complete, but Marek remained unpaid. This document, which purports to summarize each of his phone conversations with Johnson, states that in the April conversation with Johnson, Johnson "assured me the customer, Delmonico, was in `good standing' and `the project was current'." This written record varies significantly from Trojanowsky's verbal testimony in court as to the substance of that conversation. Moreover, the accuracy of the written record made by Trojanowsky is itself questionable. It was Belfonti, not Delmonico, who was the Bank's customer in 1989; therefore, there is no basis for crediting the written statement that Johnson spoke with reference to Delmonico's financial standing. Trojanowsky's contemporaneous, written record of the June, 1989 phone conversation also differs from Trojanowsky's in-court testimony.
Trojanowsky also contradicted himself indifferent parts of his in-court testimony. At one point he testified that he did not know who the owner of Pondview Estates was until Marek's work was completed in July, 1989. At another point, Trojanowsky testified that he spoke with the Pondview owner, Belefonti, in CT Page 8210 early June, 1989.
After a review of all the evidence, the court finds, first, that Trojanowsky, in his testimony before the court, exaggerated the extent of his reliance on his phone calls with Johnson, particularly the April 1989 conversation. Evidence submitted at trial shows that Marek personnel carefully checked Delmonico's credit. This evidence belies Trojanowsky's testimony that the credit of the general contractor was not as important to Marek as a brief phone conversation with an officer of the far distant bank providing the project financing. It is also significant to note that Trojanowsky's testimony is in conflict with the allegations of the counterclaim, which alleges that NHSB was called only after Marek began work and became concerned about getting paid. Secondly, the court credits Johnson's testimony that Trojanowsky asked for Johnson's opinion as to the likelihood of Marek getting paid and that Johnson accurately reported his belief. The court finds that Johnson offered general assurances, not specific promises, to Trojanowsky. In an effort to strengthen Marek's claim against NHSB, Trojanowsky has attempted to add details to what were in fact vague and brief conversations.
Section 90 of the Restatement (Second), Contracts (1973) provides in pertinent part:
 [A] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
Although generally in the law of contracts a promise is not enforceable without consideration, § 90 provides for enforceability based on reliance under the doctrine of promissory estoppel. D'Ulisse-Cupo v. Board of Directors ofNotre Dame High School, 202 Conn. 206, 213 (1987).
 A fundamental element of promissory estoppel, therefore is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all. CT Page 8211
(Emphasis added.) Id.
Restatement (Second), Contracts provides its own definition of the word "promise" in § 2(1):
 A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.
Subsection f of the Comment to § 2(1) notes that a promise must be distinguished from "a statement of opinion or a mere prediction of future events."
In the three phone conversations which occurred prior to Marek completing its work, Johnson expressed to Trojanowsky his opinion that Marek would be paid. Johnson did not state that he, personally, would pay Marek, nor did he state that NHSB would pay Marek, either of which statements would be a "promise" within the meaning of § 2(1) of the Restatement (Second), Contracts. Johnson did not manifest an "intention to act or to refrain from acting" in a stated way. His statement therefore was not a promise but an "opinion or a mere prediction of future events."
In a case where a non tenured teacher allegedly relied on statements made by the school principal concerning the likelihood of her being rehired for the next school year, the Supreme Court held that the statements made by the principal were not sufficiently promissory or definite to support a claim of promissory estoppel. D'Ulisse-Cupo v. Board of Directors ofNotre Dame High School, supra, 202 Conn. 214. Some of the statements in question are remarkably similar to the opinion expressed by Johnson. The principal said there would be "no problem" with the teacher's employment the following year and that "everything looked fine" for her rehire. There is no liability on the part of NHSB here based on promissory estoppel just as there was no liability on the part of the directors of the high school in D'Ulisse-Cupo v. Board of Directors of NotreDame High School. There is no merit to the first count of the plaintiff's complaint.
In the second count of its amended complaint, Marek alleges that NHSB was unjustly enriched in the amount of $102,829, the CT Page 8212 balance due Marek, in that NHSB became the owner of Pondview Estates on or about December 15, 1992, thereby acquiring the value of the drywall work done by Marek at the property. A right of recovery under unjust enrichment is equitable and "applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. 5 S. Williston, Contracts (Rev. Ed.) § 1479." Hartford Whalers Hockey v.Uniroyal Goodrich Tire Company, 231 Conn. 276, 282 (1994). It is a precondition to recovery under the theory of unjust enrichment that no remedy is available by an action on the contract. Id., 286.
Marek failed to show that there was no remedy available to Marek by an action on its written contract with Delmonico. In the absence of any evidence of this precondition, Marek cannot sustain its claim. Moreover, even if Marek had shown the unavailability of a remedy against Delmonico on the contract, Marek still would not prevail on its unjust enrichment claim.
In order for a plaintiff to recover on a claim of unjust enrichment, the plaintiff must show: (1) the defendant was benefitted [benefited]; (2) that the benefit was unjust; and (3) that the failure of payment was to the plaintiff's detriment. ProvidenceElectric Co. v. Sutton Place, Inc., 161 Conn. 242, 246 (1971);Burns v. Koellmer, 11 Conn. App. 375, 383 (1987). It must be noted, first, that neither party to this case found any precedent for the application of the principle of unjust enrichment to a claim by a subcontractor against a mortgagee which, at the time of the performance by the subcontractor, was neither a mortgagee in possession nor the record owner of the property in question. At the time when Marek completed its work at Pondview Estates in July, 1989, NHSB had not initiated this foreclosure, which was not served until on or about December 15, 1992. (Marek's reliance on Pleines v. Franklin ConstructionCo., 30 Conn. App. 612 (1993), is misplaced because the facts were materially different. First, the property owner in that case specifically asked the subcontractor to perform certain work despite no agreement as to price. Secondly, the owner was the record owner of the property at the time when the request was made and the work was done.)
Moreover, even if it could be said that NHSB benefited from the drywall work done by Marek when NHSB acquired title to Pondview Estates some three and a half years after Marek CT Page 8213 installed the drywall, clearly the benefit was not unjust for several reasons. First, Marek never looked to NHSB to pay the balance due under its contract with Delmonico until it filed the counterclaim now before the court. Marek never billed NHSB, never wrote a letter to NHSB seeking payment. Secondly, Richard Johnson's statements over the telephone to Trojanowsky predicting the likelihood of Marek recouping payment were not intended to cause Marek to stay on the job and do the drywall work. Thirdly, it must be considered that NHSB itself took a significant loss on its mortgage transaction with Common Constructign Company, Inc. The bank's loss was $3,750,000, which figures significantly in the court's finding that any benefit which NHSB might have received from Marek's drywall work at Pondview Estates was not unjust. The determination by the trial court of whether a failure to pay was unjust is a factual finding which is subject to only a limited scope of review on appeal. Hartford Whalers Hockey v. Uniroyal Goodrich TireCompany, supra, 231 Conn. 283.
Judgment is entered for New Haven Savings Bank, the defendant on the counterclaim, with costs.
VERTEFEUILLE, J.